UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

|  |  |
|---|---|
| In re | CASE NO. 09-34791-BKC-RBR<br>CHAPTER 11 |
| ROTHSTEIN ROSENFELDT ADLER, P.A., | |
|     Debtor. | |

_____/

|  |  |
|---|---|
| HERBERT STETTIN, not individually but<br>as Chapter 11 Trustee of the estate of the<br>Debtor, Rothstein Rosenfeldt Adler, P.A., | ADV. NO. 10-03802-BKC-RBR-A |
|     Plaintiff, | |
| v. | |
| CENTURION STRUCTURED GROWTH<br>LLC, a Delaware limited liability company,<br>PLATINUM PARTNERS VALUE<br>ARBITRAGE FUND LP, a Cayman Islands<br>limited partnership, and LEVEL 3 CAPITAL<br>FUND LP, a Delaware limited partnership, | |
|     Defendants. | |

_____/

**MOTION OF PLAINTIFF, CHAPTER 11 TRUSTEE HERBERT STETTIN, FOR
PARTIAL SUMMARY JUDGMENT AGAINST THE DEFENDANTS AS TO THE
DEBTOR'S ACTUAL INTENT TO HINDER, DELAY OR DEFRAUD CREDITORS**

**AND**

**REQUEST FOR JUDICIAL NOTICE**

HERBERT STETTIN (the "Trustee" or "Stettin"), the Chapter 11 Trustee of Rothstein

Rosenfeldt Adler P.A. ("RRA" or the "Debtor"), pursuant to Fed. R. Bankr. P. 7056, files this

Motion for Summary Judgment as to the Debtor's actual intent to hinder, delay or defraud

creditors (the "Motion") on Counts 1, 8, 9, and 17 of the Complaint [D.E. 1] against

CENTURION STRUCTURED GROWTH LLC, PLATINUM PARTNERS VALUE ARBITRAGE FUND LP, and LEVEL 3 CAPITAL FUND LP ("Centurion," "Platinum," and "Level 3," respectively, or collectively the "Defendants") pursuant to 11 U.S.C. § 548(a)(1)(A) and Fla. Stat. § 726.105(1)(a),[1] and says:

A.     **Introduction**

The dispositive facts upon which this Motion is premised are well-known and are not subject to dispute.  From 2005 through November 2009, Scott W. Rothstein ("Rothstein") perpetrated the largest Ponzi Scheme in South Florida history by using RRA to solicit and secure investments in fictitious pre-suit discounted settlements between RRA's fictitious clients and fictitious defendants (the "Ponzi scheme").  Defendants are largely unregulated hedge funds and "fund of funds" or so-called "feeder funds" which channeled their investor funds to RRA in order to fund pre-suit discounted settlements and to profit on spectacular returns consisting of interest and the significant yield between the lump sum payments and the full settlement proceeds.  The transactions between the Debtor and the Defendants were thus integral and essential components of the Ponzi scheme.

Since the pre-suit discounted settlements were fictitious and generated no profit whatsoever, Rothstein transferred and commingled hundreds of millions of dollars (if not a sum in excess of a billion dollars) between and among RRA's trust, payroll, and operating accounts so that he could use funds supplied by new investors in order to repay earlier investors, to cover RRA's operating deficits, and to fund his lavish lifestyle.  Rothstein's banking activities rendered RRA's financial institution accounts hopelessly commingled and destroyed the character or

---

[1]  Citations to the Bankruptcy Code shall be referenced as "Section ___" unless otherwise noted.

integrity of RRA's trust accounts.   In furtherance of the Ponzi scheme, RRA transferred $125,302,756.72 through a mere conduit to Centurion in the period April 25, 2008 through October 22, 2009, transferred $260,326,572.69 through a mere conduit to Platinum in the period July 28, 2008 through October 23, 2009, transferred $6,000,000.00 directly to Platinum on October 2, 2009, and transferred $26,392,724.60 through a mere conduit to Level 3 in the period November 20, 2008 through August 28, 2009 (collectively, the "Transfers").   In total, the Debtor transferred $418,022,054.01 to the Defendants in the 2 and 4 year periods prior to the Petition Date.   The Debtor's Transfers to the Defendants were necessarily made with intent to hinder, delay or defraud present or future creditors.

On January 27, 2010, Rothstein pleaded guilty to a five count information charging him with engaging in a racketeering conspiracy, money laundering conspiracy, mail and wire fraud conspiracy, and committing acts of wire fraud.   On June 9, 2010, Rothstein was sentenced to fifty years imprisonment for his crimes.

This bankruptcy case was commenced after the collapse and revelation of Rothstein's Ponzi scheme.   The Trustee has commenced this avoidance action against the Defendants in an effort to discharge his fiduciary duty to maximize the pool of assets available for distribution to creditors of the Debtor's estate.   This Motion, facts which may be judicially noticed by the Court, and the supporting affidavits demonstrate that there are no genuine issues of material fact that (a) the Transfers constituted "interest[s] of the [D]ebtor in property" within the meaning of Section 548(a)(1); (b) the Transfers were made within the 2 and 4 year periods prior to the Petition Date; (c) the Debtor made the Transfers with the actual intent to hinder, delay or defraud its creditors within the meaning of Section 548(a)(1)(A) and Section 726.105(1)(a) of the Florida Statutes; (d) the Debtor made $6,000,000 of the Transfers directly to Platinum; and (e) the

Debtor made $412,022,054.01 of the Transfers through mere conduits to the Defendants as initial transferees within the meaning of Section 550(a)(1). Accordingly, the Trustee respectfully submits that this Court should grant partial summary judgment in his favor and against the Defendants on his claims under Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) in Counts 1, 8, 9, and 17 of the Complaint as to the Debtor's actual intent to hinder, delay or defraud its creditors pursuant to Federal Rule 56. The entry of partial summary judgment in favor of the Trustee would serve to streamline and narrow the issues and claims remaining for trial.

> **B.**    **The Summary Judgment Standard**

Federal Rule 56(c)(2) is incorporated into Bankruptcy Rule 7056 and provides that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). A fact is deemed "material" if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 246, 248 (1986). A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-movant. *Id*. at 247.

The moving party has the initial responsibility of informing the court of the basis for its motion and of identifying those portions of the pleadings, depositions and any affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *see also, Slattery v. Precision Response Corp*., 167 Fed. Appx. 139, 142 (11th Cir. 2006) (stating that "[a] party seeking summary judgment must demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). In

deciding whether the movant has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-movant. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1532 (11th Cir. 1992). "If reasonable minds could differ on the inferences arising from the undisputed facts, summary judgment should be denied." *Id.* at 1534. However, the existence of disputed issues of fact will not result in denial of a motion for summary judgment unless the disputed issues are material to the determination of the legal claims and defenses. *See Anderson*, 477 U.S. at 248 ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). If the record in its entirety could not lead a rational trier of fact to find for the non-movant, then no genuine issue remains for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).

Once the movant establishes its initial burden, the burden shifts to the non-movant to establish that there is a specific and genuine issue of material fact to warrant a trial. *Celotex*, 477 U.S. at 324. The non-movant must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'" establish that there is a specific and genuine issue of material fact warranting a trial. *Id.* Conjecture, surmise or "metaphysical doubt" by the non-movant of the movant's assertions will not defeat a summary judgment motion. *See Matsushita*, 475 U.S. at 586. Self-serving conclusory statements are also insufficient to defeat summary judgment. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993). The non-movant must present specific significant probative evidence supporting its case sufficient "to require a . . . judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249 (citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient, there must be

5

evidence on which the jury could reasonably find for the [nonmovant]." *Id*. at 252. The non-movant must present "substantial evidence" to overcome the motion, and the court must analyze "the evidence presented through the prism of the substantive evidentiary burden." *Id*. at 250 – 254. "If, however, the evidence tendered is 'merely colorable,' or is 'not significantly probative,' the non-moving party has not carried its burden and the court must grant summary judgment to the moving party." *In re Calstar, Inc*., 159 B.R. 247, 252 (Bankr. D. Minn. 1993); *Celotex Corp*., 477 U.S. at 322-323 ("[f]ailure to make a showing sufficient to establish the existence of any essential element of a claim is fatal and requires the entry of summary judgment.")

**C.     Statutory Requirements for the Trustee to Prevail on his actual fraudulent transfer claims in Counts 1, 8, 9 and 17 of the Complaint**

The Trustee seeks partial summary judgment on his claims under Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) in Counts 1, 8, 9, and 17 of the Complaint as to the Debtor's actual intent to hinder, delay or defraud its creditors.[2] The Trustee's *prima facie* case for intentional fraudulent conveyance is governed by Section 548(a)(1)(A). To prevail on a claim under Section 548(a)(1)(A), the Trustee has the burden of proving the following elements by a preponderance of the evidence: (1) a transfer; (2) of an interest of the debtor in property; (3) within the statutory time period; (4) made by the debtor with actual intent to hinder, delay, or defraud any current or future creditor of the debtor. *Fransen v. Nicassio Corp. (In re Metro Sewer Servs.)*, 374 B.R. 316, 324 (Bankr. M.D. Fla. 2007) (citing *Kapila v. WLN Ltd. P'ship (In*

---

[2] Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) are substantially the same, with the result that "the analysis of what must be shown to prove actual fraud under both the bankruptcy and state law fraudulent transfer provisions is the same." *In re McCarn's Allstate Finance, Inc*., 326 B.R. 843, 849 (Bankr. M.D. Fla. 2005); *Menchise v. Clark (In re Dealers Agency Servs.)*, 380 B.R. 608, 612 (Bankr. M.D. Fla. 2007).

6

*re Leneve)*, 341 B.R. 53, 56 (Bankr. S.D. Fla. 2006)).[3]   Under section 548(a)(1)(A), the entire

amount of any "transfer" made by the debtor with the actual intent to hinder, delay, or defraud

creditors may be avoided whether or not the debtor received value in exchange for the transfer.

*See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Gp., LLC)*,

396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008).   Only the intent of the transferor is relevant under

Section 548. *Id.*   The statute by its express terms applies only if "the *debtor* . . . made such

transfer with intent to hinder, delay, or defraud," thus it is only the debtor's intent that is

relevant.   *See* Section 548(a)(1)(A).   The intent of the transferee is not relevant except under the

"good faith" defense of Section 548(c), upon which the Trustee has not sought summary

judgment at this time and upon which the Defendants bear the burden of proof.   As explained in

detail below, the Trustee has established all of the required elements under Section 548(a)(1)(A)

and Florida Statute Section 725.105(1)(a).

        **D.**    **Undisputed Facts of Record**

The following facts are established and are not subject to dispute in this case.

    1.    On or about April 3, 2008, Centurion as Lender and Banyon Funding, LLC as

Borrower entered into various loan agreements including, but not limited to, a

Credit Agreement, Promissory Note, Guaranties, and Clearing Account

Agreements (as subsequently amended and restated) for the specific purpose of

providing $50,000,000 of capital for investments in the Debtor's purported, pre-

suit discounted settlements (hereinafter referred to collectively as the "Centurion

Loan Documents").   True and correct copies of the Centurion Loan Documents

---

    [3]   Under Florida Statute Section 726.105(1)(a) the Trustee may recover transfers that
occurred within four years from the petition date.

are attached as ***Composite Exhibit 1***.

2.      On or about June 26, 2008, Platinum as Lender and Banyon Investments, LLC as Borrower entered into various loan agreements including, but not limited to, a Credit Agreement, Promissory Note, Guaranties, and Clearing Account Agreements (as subsequently amended and restated) for the specific purpose of providing $150,000,000 of capital for investments in the Debtor's purported, pre-suit discounted settlements (hereinafter referred to collectively as the "Platinum Loan Documents").  True and correct copies of the Platinum Loan Documents are attached as ***Composite Exhibit 2***.

3.      On or about November 3, 2008, Level 3 as Lender and Banyon Resources, LLC as Borrower entered into various loan agreements including, but not limited to, a Credit Agreement, Promissory Note, Guarantees, and Clearing Account Agreements (as subsequently amended and restated) for the specific purpose of providing $50,000,000 in capital for investments in the Debtor's purported, pre-suit discounted settlements (hereinafter referred to collectively as the "Level 3 Loan Documents").  True and correct copies of the Level 3 Loan Documents are attached as ***Composite Exhibit 3***.

4.      The Clearing Account Agreements specifically contemplated that the Debtor would make transfers from its financial institution accounts into so-called "collection accounts," nominally titled in the names of Banyon Funding, LLC, Banyon Investments, LLC, and Banyon Resources, LLC (collectively, the "Banyon Entities"), and that the Defendants would have exclusive dominion and control over such accounts at all relevant times (the "Banyon Collection

Accounts").[4]  True and correct copies of the Clearing Account Agreements are attached as ***Composite Exhibit 4***.

5.     Between April 25, 2008 and October 23, 2009, the Debtor transferred $418,022,054.01 to the Defendants.  *See* Affidavit and Tracing Analysis of Joel D. Glick, CPA/CFF, CFE of Berkowitz Dick Pollack & Brant [D.E. 39] (hereinafter the "Tracing Analysis").  More specifically, the Debtor transferred $125,302,756.72 through a mere conduit to Centurion in the period April 25, 2008 through October 22, 2009, transferred $260,326,572.69 through a mere conduit to Platinum in the period July 28, 2008 through October 23, 2009, transferred $6,000,000.00 directly to Platinum on October 2, 2009, and transferred $26,392,724.60 through a mere conduit to Level 3 in the period November 20, 2008 through August 28, 2009 (collectively, the "Transfers").  *Id.*

6.     On November 2, 2009, Stettin was appointed receiver of RRA in an action commenced in Broward County Circuit Court styled *Stuart Rosenfeldt and Rothstein Rosenfeldt Adler, P.A. v. Scott W. Rothstein*, Case No. 09-059301(07).

7.     On November 10, 2009 (the "Petition Date"), a group of petitioning creditors filed an involuntary petition for reorganization under Chapter 11 of the Bankruptcy Code against the Debtor.  *See* Main Bankruptcy Case, D.E. 1.

---

[4]     Specifically, the Clearing Account Agreements provide in numbered paragraph 6 thereof that "Clearing Bank and [the Banyon Entities] each acknowledges and agrees that the Clearing Account ***is subject to the sole dominion, control and discretion of [the Defendants] and [the Banyon Entities] shall not have any right to close such account or right of withdrawal with respect to such account except as provided for in this Agreement***."  (Emphasis added).  The Clearing Account Agreements also provide in numbered paragraph 3 thereof that disbursements from the Banyon Collection Accounts would be made from the Banyon Collection Accounts to the Defendants' designated accounts on the last business day of each month.

8.    By order dated November 20, 2009, Stettin was appointed and continues to serve as the Chapter 11 Trustee for the Debtor's bankruptcy estate. *See* Main Bankruptcy Case, D.E. Nos. 30, 35 and 55.

9.    RRA consented to the entry of an Order for Relief under Chapter 11 of the Bankruptcy Code on November 25, 2009 and the Order for Relief was entered on November 30, 2009. *See* Main Bankruptcy Case, D.E. Nos. 57 and 66.

10.    On December 1, 2009, Scott W. Rothstein ("Rothstein"), was charged in a five-count Information by the Federal Government of perpetrating a $1.2 billion Ponzi Scheme involving the sale of fictitious pre-suit discounted settlements (the "Confidential Settlements"). *See United States of America v. Scott W. Rothstein*, United States District Court for the Southern District of Florida, Case Number 0:09-cr-60331-JIC (the "Criminal Proceeding") [D.E. 1] (hereinafter the "Information").[5]

11.    On January 27, 2010, Scott Rothstein pleaded guilty to all counts of the Information. *See* Criminal Proceeding, [D.E. 69] (the "Plea Agreement").

12.    The District Court accepted the Plea Agreement and subsequently sentenced Rothstein to 50 years in federal custody. *See* Criminal Proceeding, [D.E. 290] (the "Sentencing Order").

---

[5] This Court has ruled that "a bankruptcy judge may take judicial notice of the records on file before the court, as well as the relevant records of other courts both within and outside of the federal system." *See In re Loe*, 2007 Bankr. LEXIS 1146, at *4 (Bankr. S.D. Fla. March 29, 2007); FED. R. EVID. 201(c) and (d). Accordingly, the Trustee requests that the Court take judicial notice of the Information [D.E. 1], the Plea Agreement [D.E. 69], and the Sentencing Order [D.E. 290] filed in the Criminal Proceeding, all of which are attached as ***Composite Exhibit 5***.

13.    On March 11, 2011, the Trustee filed the Tracing Analysis in this adversary proceeding.   The Tracing Analysis confirms that the Debtor commingled and converted "law firm revenues, client funds and investor funds" and "as a result, payments to the [Defendants] contained funds deposited by other parties."  *See* Tracing Analysis, p. 2.

14.    In connection with the adversary proceeding styled *Herbert Stettin, Chapter 11 Trustee v. Russell Adler, et al.,* Case Number 10-02612-BKC-RBR-A (hereinafter the "Adler Adversary"), Plaintiff submitted an Affidavit in support of his motion for partial summary judgment as to the Debtor's actual intent to hinder, delay or defraud creditors.  *See* Adler Adversary, D.E. 106, pp. 97 - 99.  The Affidavit of Herbert Stettin (the "Stettin Affidavit") states that RRA was formed in February 2002 and grew to have 70 lawyers and over 150 staff members.  Id. at ¶¶ 3 and 4.  While the law firm did perform legitimate legal work, the expenses of the law firm were not supported by the revenues generated from legal work.  *Id*. at ¶ 4.  In order to attain the visibility and apparent, but not actual, success that RRA achieved, Rothstein, using firm assets and acting contrary to the interests of RRA, ran a Ponzi scheme and looted the firm for his benefit.  *Id*. at ¶ 5.  The funds from the Ponzi scheme and legitimate funds were commingled in law firm-owned bank accounts.  *Id*.

15.    By Order entered on December 14, 2010 in the Adler Adversary, this Court ruled that the Debtor "was involved and intertwined with the Ponzi and that the Transfers made to the [Adlers] were made with the actual intent to hinder, delay or defraud the current and future creditors of RRA."  *See* Adler Adversary, D.E.

11

148-1, p. 10.  A true and correct copy of the Order is attached as ***Exhibit 6***.

16.     On August 26, 2010, this Court entered an Order holding that 26 of the Debtor's accounts and funds maintained therein at T.D. Bank "constitute[d] property of the estate and shall be turned over to the Trustee in accordance with this Order."  *See* Main Bankruptcy Case, D.E. 937 (the "Turnover Order"), ¶ 1.

### E.     Legal Argument and Citation to Authority

There are no genuine issues of material fact with respect to the Trustee's claims under Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) in Counts 1, 8, 9, and 17 of the Complaint as to the Debtor's actual intent to hinder, delay or defraud its creditors and, therefore, the Trustee is entitled to partial summary judgment against the Defendants as a matter of law.[6]

### I.     *The Transfers constituted "interest[s] of the [D]ebtor in property" within the meaning of Section 548(a)(1)*.

One element of the Trustee's prima facie case under Section 548(a)(1) is that there was a transfer of an "interest of the debtor in property."  *See Fransen*, 374 B.R. at 324.  The threshold question under this provision is whether each transfer was in fact property of the debtor.  *United States v. Kapila*, 402 B.R. 56, 60 (S.D. Fla. 2008).  The Transfers clearly constituted "interest[s] of the [D]ebtor in property."

As set forth in the Tracing Analysis, the Transfers made by the Debtor to the Defendants originated from accounts titled in the Debtor's name at T.D. Bank.  *See also*, Trustee's Agreed Motion for Turnover, Main Bankruptcy Case, D.E. 898, Exhibit A (the "Turnover Motion"), the Turnover Order, and the Stipulation Dismissing The United States Of America in the adversary

---

[6] Although the Trustee has only sought summary judgment on his *prima facie* case as to the Debtor's actual intent to hinder, delay or defraud creditors pursuant to Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a), he reserves the right to seek further relief as any other count or any defense raised by the Defendants.

proceeding styled *T.D. Bank, N.A. v. Herbert Stettin, Chapter 11 Trustee, et al.*, Case No. 09-02464-BKC-RBR-A (hereinafter the "TD Adversary"), D.E. 87, Exhibit A.   The Tracing Analysis and the Stettin Affidavit establish that the funds on deposit in the Debtor's financial institution accounts were hopelessly commingled and that the character or integrity of the Debtor's trust accounts was destroyed.   In the Tracing Analysis, Glick concludes that "law firm revenues, client funds and investor funds were commingled" and "as a result, payments to the [Defendants] contained funds deposited by other parties."   *Id.* at 2.   Glick's conclusion is supported by the "$1.249 billion of [approximately 2,000] inter-account transfers flowing in and among the RRA bank accounts" and of the $1.773 billion flowing into and out of the RRA bank accounts.   *Id.* at 2 and 8.   Glick also states as follows:

> The sheer magnitude in terms of the number of the transfers and the number of accounts involved demonstrates a commingling of funds, in the operating accounts, payroll accounts, trust accounts, and third-party accounts.  The result of the diverting and commingling of funds was such that at any given time it was extremely difficult, if not impossible, to identify, with a reasonable degree of certainty, the exact source of the funds in any of the RRA accounts.  To clarify, while the inflows from and outflows to the [Banyon Entities] have been traced with certainty to and from RRA, the commingling and fungible nature of cash make it such that the ending balances in the RRA accounts cannot be identified as to funding source.

*Id.* at 8.   Glick also notes that Rothstein acknowledged in his stipulated statement of facts in the Criminal Proceeding, that ". . . funds were disbursed among and between the various trust accounts and elsewhere…in order to facilitate, promote and conceal the fraud, to launder the proceeds derived therefrom and to enrich [him] and his co-conspirators."[7]   Finally, Glick concludes that RRA created or supplemented account balances by transferring "surplus funds taken from the other 'investor' accounts," commingled those funds with other funds, and that "ultimately the [Defendants] received not only return of their own funds but also funds belonging

---

[7]  See Plea Agreement, p. 11.

13

to others." *Id.* at 12.  The Stettin Affidavit similarly attests that funds from Rothstein's Ponzi scheme and legitimate funds were commingled in the Debtor's financial institution accounts.

The Tracing Analysis and the Stettin Affidavit come as no surprise, knowing what we now know, in light of the Information and Rothstein's plea admitting to each and every allegation thereof.  First, the Information states that Rothstein "did knowingly conduct and participate, directly and indirectly, in the conduct of the affairs of [RRA] through a pattern of racketeering activity. . . ." *Information*, p. 2.  Further, the Information states that "the principal purpose of the racketeering conspiracy was to generate money for the defendant and his co-conspirators through the operation of [RRA] and through various criminal activities, including mail fraud, wire fraud, and money laundering."  *Id.* at 3.  "The criminal activity that Rothstein orchestrated was conducted through the "base of operations at the office of [the Debtor]."  *Id.* The scam at the heart of Rothstein's criminal activity involved the use of the Debtor's bank accounts and involved the elaborate preparation of fake court documents and law firm bank accounts, none of which would have been possible without the existence of RRA as a law firm and its clients.  *Id.*  On January 27, 2010, Rothstein pleaded guilty to all counts on the Information, admitting that he used the trust accounts established and maintained by RRA at various financial institutions "in order to receive the investor funds and to give the appearance of legitimacy and security."  See *Plea Agreement,* p. 11.

In the Eleventh Circuit, it is well-established that a transfer is avoidable under Section 548 only if the debtor exercised actual control over the property transferred.  See *Nordberg v. Sanchez (In re Chase & Sanborn Corp.),* 813 F.2d 1177, 1181-82 (11th Cir. 1987).  This standard is frequently referred to as the "control test."  In *Chase & Sanborn,* the issue was whether the challenged funds were property of the debtor corporation.  *Chase & Sanborn,* 813

F.2d at 1180.  There, the Eleventh Circuit ultimately concluded that the funds at issue were not property of the estate because "although the debtor ha[d] possession of the funds, it did not have sufficient control over the funds to warrant a finding that that the funds were the debtor corporation's property."  *Id.*  The Eleventh Circuit stressed that when determining whether the debtor has control over funds transferred…"the court must look beyond the particular transfers in question to the entire circumstance of the transactions."  *Id.* at 1181-82.  A mere "tangential" interest in deposited funds and the absence of a debtor-creditor relationship with the transferee were critical to the Court's finding.  *Id*. at 1181.

Recently, the District Court for the Southern District of Florida had occasion to apply *Chase & Sanborn* to an appeal of a bankruptcy court order finding that the incurrence of debt and pledge of assets by subsidiaries could be avoided as fraudulent transfers under Section 548(a)(1) and ordering disgorgement of the associated loan proceeds because they were used to repay an old loan for which the subsidiaries and their assets were not liable.  *3V Capital Master Fund Ltd. v. Official Committee of Unsecured Creditors of Tousa, Inc. (In re Tousa)*, --- B.R. ---, No. 10-60017, 2011 WL 522008, at * 17-18 (S.D. Fla. Feb. 11, 2011).  Since the loan agreement at issue in *Tousa* required the loan proceeds to be used to repay an old loan owed by the parent company and were never paid to the subsidiaries, the District Court concluded that the subsidiaries never had "control" over, or a property interest in, the loan proceeds and therefore could not recover the proceeds.  *Id*. at * 23 and 25.  In so holding, the District Court stated as follows:

> The Eleventh Circuit's control test encompasses two elements: (1) the power to designate which party will receive the funds, and (2) the power to actually disburse the funds at issue to that party.  In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

*Id*. at * 24 (citing *Tolz v. Barnett Bank of S. Fla. (In re Safe-T-Brake of S. Fla., Inc.)*, 162 B.R. 359, 365 (Bankr. S.D. Fla. 1993). The District Court further noted that "[t]he Bankruptcy Court erred by failing to apply the Eleventh Circuit's control test to the totality of the circumstances as established by the actual documents governing the transactions." *Id*. The District Court concluded that "[t]he overwhelming evidence was that [the parent company], and not the [subsidiaries], controlled the transfer at issue [and therefore] the funds were not the property of the debtor and the transfer is not avoidable under a 'direct transfer' theory." *Id*. at * 25. (Citing *In re Chase & Sanborn*, 813 F.2d at 1182).

Unlike in *Chase & Sanborn* and *Tousa*, however, RRA clearly had actual and substantial control over the commingled funds on deposit in its financial institution accounts, including the Transfers made to the Defendants. For approximately four years, the Debtor used funds deposited by new investors in its financial institution accounts at its whim and in its discretion to make transfers to earlier investors (as well as to fund Rothstein's lavish lifestyle) from its financial institution accounts. It cannot be disputed that Rothstein successfully launched and propelled his Ponzi scheme by virtue of the Debtor's "control over identifying the payee, and control over whether the payee will actually be paid." *Tousa*, supra at * 24. Additionally, the Debtor undertook direct liability for the funds deposited by investors into its financial institution accounts by executing and delivering a guaranty as part of the so-called Confidential Settlement Documents. While Rothstein may have directed the flow of funds from the RRA bank accounts to further his Ponzi scheme, he had no individual lawful interest in the funds nor did he have any obligation to repay its funds. RRA had both the right to hold and control the funds and the obligation to pay the Defendants. In light of the Debtor's possession, control, commingling and liability for the funds deposited into its financial institution accounts and the payment of the

16

Transfers in a manner consistent with RRA's contractual obligations, it cannot seriously be disputed that such funds were the property of the Debtor at all relevant times.

Furthermore, any transfer made or originating from RRA bank accounts are presumed as a matter of law to constitute a transfer of property of the estate. *See In re Int'l Pharm. & Discount II, Inc.*, 443 F.3d 767, 771 (11th Cir. 2005) ("funds in a debtor's account are generally presumed to be the debtor's property."). Similarly under Florida banking law, RRA as the title holder of the RRA accounts, is the presumed owner of all funds in the accounts. *See Cole v. Am. Capital Partners Ltd.,* 2009 U.S. Dist. LEXIS 122839, at *16 (S.D. Fla. Dec. 14, 2009) (holding under Florida law that the account holder is presumed to be the owner of accounts titled in that person's name); *Bernal v. All American Inv. Realty, Inc.,* No. 05-60956-CIV, 2009 WL 586010, at *4 (S.D. Fla. March 6, 2009) (noting that for garnishment purposes "deposit *prima facie* belongs to the person in whose name it stands"). Similarly, under Florida banking law, "the relationship between a bank and the holder of a deposit account is contractual." *Carl v. Republic Security Bank*, 282 F.Supp. 2d 1358, 1365 (S.D. Fla. 2003); *McCrory Stores Corp. v. Tunnicliffe*, 104 Fla. 683, 687 (Fla. 1932); *Mjz Corp. v. Gulfstream First Bank & Trust*, 420 So. 2d 396, 397 (Fla. 4th DCA 1981). Moreover, funds obtained by a debtor, even if obtained in furtherance of a Ponzi scheme, are property of the debtor for the purposes of the fraudulent transfer provisions. *Securities Investor Protection Corp. v. Old Naples Securities, Inc. (In re Old Naples Securities, Inc.)*, 343 B.R. 310, 319 (Bankr. M.D. Fla. 2006) (citations omitted).

The Information, Rothstein's Plea Agreement, the Tracing Analysis, the Stettin Affidavit, and the applicable law lead to one inescapable conclusion, the $412,022,054.01 transferred by the Debtor from its financial institution accounts through the Banyon Collection Accounts to the Defendants in the period April 25, 2008 through October 23, 2009 and the $6,000,000

transferred by the Debtor from its financial institution accounts directly to Platinum on October 2, 2009 as and for fictitious Confidential Settlement disbursements constituted "interest[s] of the Debtor in property" as a matter of law under Section 548(a)(1)(A).

> **II.**      ***The Trustee has proven that the Transfers occurred within the statutory time period.***

The Trustee must also prove that the Transfers occurred within the statutory time periods set forth in Section 548(a)(1)(A) and Florida Statute Section 726.110, which are two years and four years respectively. Since the Transfers at issue were made in the period April 25, 2008 through October 23, 2009 and the Petition Date was November 10, 2009, the Transfers were clearly made during the statutory time periods.

> **III.**      ***The Transfers were made, as a matter of law, with the intent to hinder, delay, or defraud.***

Defendants advanced funds through the Banyon Entities to the Debtor for the specific purpose of funding purported pre-suit discounted settlements and the Debtor transferred funds through the Banyon Entities to the Defendants purportedly as pre-suit settlement payments. Since the settlements were fictitious and the settlement payments were the fruit of Rothstein's Ponzi scheme, the Debtor's Transfers to the Defendants were clearly made with the actual intent to hinder, delay or defraud creditors. Indeed, the Debtor's Transfers to the Defendants were inherently fraudulent and constituted an integral and essential component of the Ponzi scheme. Rothstein's Plea Agreement reflects these facts and establishes the Debtor's actual intent to hinder, delay or defraud creditors as a matter of law.

Courts nationwide, including this Court, have recognized that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud. *Bauman v. Bliese (In re McCarn's Allstate Finance, Inc.)*, 326 B.R. 843, 850 (Bankr. M.D. Fla. 2005); *Gredd v. Bear,*

*Stearns Securities Corp. (In re Manhattan Inv. Fund, Ltd.)*, 359 B.R. 510, 517 (Bankr. S.D.N.Y. 2007); and the Adler Adversary, D.E. 148, at pp. 8 and 9.  This is because a debtor who runs a Ponzi scheme knows that his future investors will lose their money and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Bayou Group,* 396 B.R. at 835[8] (citing *McCarn's Allstate Finance*, 326 B.R. at 851; *Rosen v. Neilson (In re Slatkin)*, 310 B.R. 740, 748 (C.D. Cal. 2004), *aff'd*, 222 Fed. Appx. 545 (9th Cir. 2007); *Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir. 1995), *cert. denied sub nom African Enterprise, Inc. v. Scholes*, 516 U.S. 1028, 133 L. Ed. 2d 522, 116 S. Ct. 673 (1995); and *Emerson v. Maples (In re Mark Benskin & Co., Inc.)*, 161 B.R. 644, 648-49 (Bankr. W.D. Tenn. 1993)).  This is referred to as a "Ponzi scheme presumption."  *Bear, Stearns Securities Corp. v. Gredd (In re Manhattan Investment Fund, Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) (transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors).  Accord, *Old Naples Securities, Inc.*, 343 B.R. at 319-320 (collecting cases adopting the Ponzi scheme presumption).   As one court put it,

> "[o]ne can infer an intent to defraud future undertakers from the mere fact that a debtor was running a Ponzi scheme.  Indeed, no other reasonable inference is possible.  A Ponzi scheme cannot work forever.  The investor pool is a limited resource and will eventually run dry.  The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors.  The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors.  He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money.  Knowledge to a substantial certainty constitutes intent in the eyes of the law.  *cf.* Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them.

*Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987).

---

[8]    *Aff'd and rev'd in part by, Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284 (S.D.N.Y. 2010).

In other words, the law is clear that a "Ponzi scheme" is by definition fraudulent. By extension, any acts taken in furtherance of the Ponzi scheme are also fraudulent. Every payment made by the debtor to keep the scheme on-going was made with the actual intent to hinder, delay, or defraud creditors, primarily the new investors." *Cuthill v. Greenmark, LLC (In re World Vision Entm't, Inc.)*, 275 B.R. 641, 656 (M.D. Fla. 2002); *Old Naples Securities*, 343 B.R. at 319-20; *McCarn's Allstate Finance,* 326 B.R. at 845.   It is also well established that "criminal convictions based on operating a Ponzi scheme establish fraudulent intent for the purposes of the fraudulent transfer provisions." *Old Naples Securities*, 343 B.R. at 320 (holding that a debtor's guilty plea to allegations of information which charged him with operating fraudulent scheme whereby "investors' funds were used to make interest and principal payments on promissory notes previously issued to other investors," was sufficient to establish that he had operated Ponzi scheme, and that commission payments that he made to brokers for procuring investors were made with actual intent to defraud creditors).

In *Bauman v. Bliese*, Judge Williamson entered partial summary judgment in favor of the Trustee against brokers who received transfers in the form of commissions for the initial sales and later the renewals of notes that were part of the Ponzi scheme. *Bauman*, 326 B.R. at 845-46. The Trustee sought partial summary judgment on his *prima facie* case, leaving the resolution of any affirmative defenses for trial. *Id.*  The Trustee sought recovery from individuals who did nothing more than what they had been hired to do - find investors for what they believed to be a legitimate business. *Id* at 846.  Judge Williamson held that "the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent." *Id.* At 850.  Judge Williamson further explained that one of the evidentiary bases for establishing the existence of a Ponzi scheme is the guilty plea of a criminal defendant. *Id* at 851 (collecting cases).  Relying entirely on the plea agreement of the

criminal defendant, Judge Williamson entered summary judgment against the defendant in *Bauman*. *Id* at 851-52.

The situation and facts before this Court are substantially similar to the *Bauman* case. Rothstein's guilty plea is *prima facie* evidence sufficient to establish the existence of a Ponzi scheme.  In his Plea Agreement Rothstein admitted that:

    a. "he and other co-conspirators utilized funds obtained through the 'Ponzi' scheme to enrich the personal wealth of persons employed by and associated with RRA."

    b. since 2005 Rothstein "conspired with persons known and unknown to the United States Attorney, to use the law firm, [RRA] as a criminal enterprise in order to conduct a pattern of racketeering activity."

    c. he used "trust accounts at several financial institutions in order to receive investor funds and to give the appearance of legitimacy and security."

    d. Rothstein "distributed lavish gifts, including exotic cars, jewelry, boats, loans, cash and bonuses, to individuals and to members of RRA in order to engender goodwill and loyalty and to create the appearance of a successful law firm."

Additionally, Stettin states in his affidavit that "the size of the law firm was not supported by the revenues generated from legal work." *See* Stettin Affidavit, ¶ 4.

Accordingly, there can be no serious dispute as to the applicability of the "Ponzi presumption" in the matter *sub judice* and the Trustee's entitlement to partial summary judgment as a matter of law on his claims under Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) in Counts 1, 8, 9, and 17 of the Complaint as to the Debtor's actual intent to hinder, delay or defraud its creditors.

IV.    ***The Debtor's actual intent to hinder, delay or defraud creditors is also supported by the presence of several badges of fraud in connection with the Debtor's Transfers to the Defendants.***

The Debtor's actual intent to hinder, delay or defraud creditors is also supported by the presence of several badges of fraud in connection with the Debtor's Transfers to the Defendants irrespective of the Ponzi presumption and Rothstein's Plea Agreement.  Badges of fraud include: (1) a relationship between the debtor and the transferee; (2) lack of consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) the transfer of the debtor's entire estate; (5) reservation of benefits, control or dominion by the debtor; (6) secrecy or concealment of the transaction; and (7) pendency or threat of litigation at the time of the transfer.  *In re Warner*, 87 B.R. 199, 202 (Bankr. M.D. Fla. 1988) (citations omitted).  At a minimum, badges 3, 6, and 7 were present in connection with the Debtor's transfers to the Defendants.

In determining actual intent under Florida law, consideration may be given to (among other factors) whether: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was concealed; (4) before the transfer was made, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.  Fla. Stat. § 726.105(2).  At a minimum, badges 3, 4, 6 (as to Rothstein), 7, and 10 were present in connection with the Debtor's transfers to the Defendants.

Since the Debtor's actual intent to hinder, delay or defraud creditors in connection with the Transfers to the Defendants can be inferred from the presence of the aforementioned badges of fraud, partial summary judgment is properly entered in favor of the Trustee and against the Defendants as a matter of law on his claims under Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) in Counts 1, 8, 9, and 17 of the Complaint.

### V. *Defendants were "initial transferees" within the meaning of Section 550(a)(1) because the Banyon Entities were "mere conduits" between the Debtor and the Defendants.*

Defendants were "initial transferees" within the meaning of Section 550(a)(1) because the Banyon Entities were "mere conduits" between the Debtor and the Defendants.  In the Clearing Account Agreements, the Defendants and the Banyon Entities specifically contemplated and agreed that (i) the Debtor would be making periodic transfers of the fictitious proceeds of the Confidential Settlements from its financial institution accounts to a so-called "collection account" nominally titled in the names of the Banyon Entities; (ii) the Defendants would have exclusive dominion and control over the funds deposited into the collection account at all relevant times to the exclusion of the Banyon Entities; and (iii) those funds would be disbursed by the Banyon Entities to the Defendants on the last business day of each month.  In particular, the Clearing Account Agreements provide at numbered paragraph 6 thereof that the "Clearing Bank and [the Banyon Entities] each acknowledges and agrees that the Clearing Account *is subject to the sole dominion, control and discretion of [the Defendants] and [the Banyon Entities] shall not have any right to close such account or right of withdrawal with respect to such account except as provided for in this Agreement*."  (Emphasis added).  The Banyon Entities also lacked the right to unilaterally terminate the Clearing Account Agreements, to close the collection accounts, or to assign or transfer their rights or obligations under the

agreements without the Defendants' prior written consent pursuant to paragraphs 4(c) and 7.

The Clearing Account Agreements for the Platinum/Banyon Investments and Level 3/Banyon

Resources transactions also state as follows:

> 3.     <u>Transfer of Funds in Clearing Account and Control of Clearing Account</u>.

> At all times during the effectiveness of this Deposit Account Control Agreement, [Banyon Investments or Banyon Resources, as appropriate] hereby absolutely, irrevocably and unconditionally instructs, and Clearing Bank hereby agrees, that:

> ***(a)     The Clearing Bank will not comply with any Disposition Instructions originated by [Banyon Investments or Banyon Resources, as appropriate]'***

> ***(b)     Clearing Bank shall accept and execute Disposition Instructions originated by [Platinum or Level 3, as appropriate] with respect to the payment or withdrawal of any funds from the Collection Account or the payment of any funds in the Collection Account to [Platinum or Level 3, as appropriate]. [Banyon Investments or Banyon Resources, as appropriate] authorizes [Platinum or Level 3, as appropriate] to access the Collection Account through the Clearing Bank's electronic service product, Commerce TreasuryDirect ('Electronic Services') to use the services and engage in transactions thereon. [Banyon Investments or Banyon Resources, as appropriate] agrees that it will not conduct transactions on the Electronic Services but will have access for view only. The parties agree to execute the Master Agreement for Banking Services***.

(Emphasis added).    As contemplated by the Clearing Account Agreements, the Debtor's

Transfers to the Defendants originated from the Debtor's financial institution accounts -

$412,022,054.01 of the transfers were transferred through the Banyon Collection Accounts to the

Defendants in the period April 25, 2008 through October 23, 2009 and $6,000,000 was

transferred directly to Platinum on October 2, 2009.  Since the Banyon Entities lacked dominion

and control over the Debtor's transfers in the Banyon Collection Accounts and the Defendants

had exclusive dominion and control over such transfers and accounts at all relevant times, the

Banyon Entities are properly characterized as mere conduits[9] and the Defendants are properly characterized as "initial transferees" within the meaning of Section 550(a)(1).

Recently, the Eleventh Circuit clarified the circumstances under which a party is properly characterized as a "mere conduit" or as an "initial transferee" within the meaning of Section 550(a)(1).  *Martinez v. Hutton (In re Harwell)*, 628 F.3d 1312 (11th Cir. 2010).  The *Harwell* decision makes it abundantly clear that the Banyon Entities were "mere conduits" in connection with the receipt of transfers into the Banyon Collection Accounts and the disbursement of those transfers to the Defendants.  In a section of the opinion entitled "[w]hat Our Precedents Demonstrate," the Eleventh Circuit stated that it previously "carved out an equitable exception to the literal statutory language of 'initial transferee,' known as the mere conduit or control test, for initial recipients who are 'mere conduits' with no control over the fraudulently-transferred funds."  *Id*. at 1322.  (Citations omitted).  With respect to the issue of "control," the Eleventh Circuit cited its prior opinion in *Pony Express* and stated as follows:

> This Court explained that we had adopted a 'control' or 'conduit' test to determine whether the recipient of an avoidable transfer of assets is the initial transferee.  Under this test, a recipient of an avoidable transfer is an initial transferee only if they exercise legal control over the assets received, such that they have the right to use the assets for their own purposes, and not if they merely served as a conduit for assets that were under the actual control of the debtor-transferor or the real initial transferee.  In *Pony Express*, this Court pointed out that this control test takes on special significance where the recipients of avoidable transfers are agents or fiduciaries of the debtor-transferor, such as banks or, in this case, insurance brokers, who are duty-bound to take only limited actions with respect to the funds received.  Often these fiduciaries or agents are not considered initial transferees because their legal control over the assets received is circumscribed by their legal duties to their clients.  Fiduciaries or agents, however, are not immune from becoming initial transferees.  Rather, even entities that have special legal relationships with the debtor-transferor can be initial transferees when they do, in fact, take legal control of an avoidable transfer.

---

[9]   The Tracing Analysis also concludes that the Banyon Entities "acted as a conduit between the [Defendants] and RRA."  Tracing Analysis at p. 2.

*Id*. at * 9.  (Internal quotation marks omitted).  Citing *Andreini & Co. v. Pony Express Delivery Services (In re Pony Express Delivery Svcs., Inc.)*, 440 F.3d 1296, 1300-01 (11th Cir. 2006).  Since the Debtor's transfers to the Defendant went through the Banyon Collection Accounts and the Banyon Entities clearly did not have *any* dominion or control with respect to the funds in the Banyon Collection Accounts as set forth in the Clearing Account Agreements, the Banyon Entities cannot be characterized as anything other than "mere conduits" with respect to their receipt of funds into, and disbursement of funds from, such Banyon Collection Accounts.  At all times, the funds in the Banyon Collection Accounts were under the actual control of the Defendants as the real initial transferees.  The Defendants are therefore properly characterized as "initial transferees" of the Transfers made by the Debtor through the Banyon Collection Accounts to the Defendants as a matter of law under Section 550(a)(1).

      **F.**    <u>**Conclusion**</u>

      This Motion, facts which may be judicially noticed by the Court, and the Stettin Affidavit demonstrate that there is no genuine issue of material fact that (a) the Transfers constituted "interest[s] of the [D]ebtor in property" within the meaning of Section 548(a)(1); (b) the Transfers were made within the 2 and 4 year periods prior to the Petition Date; (c) the Debtor made the Transfers with the actual intent to hinder, delay or defraud its creditors within the meaning of Section 548(a)(1)(A) and Section 726.105(1)(a) of the Florida Statutes; (d) the Debtor paid $6,000,000 of the Transfers directly to Platinum; and (e) the Debtor paid $412,022,054.01 of the Transfers through mere conduits to the Defendants as initial transferees within the meaning of Section 550(a)(1).  Accordingly, the Trustee respectfully submits that this Court should grant partial summary judgment in his favor and against the Defendants on his claims under Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) in Counts 1, 8, 9,

and 17 of the Complaint as to the Debtor's actual intent to hinder, delay or defraud its creditors pursuant to Federal Rule 56.

WHEREFORE, the Plaintiff, Herbert Stettin, respectfully requests this Court to enter an Order granting him partial summary judgment against the Defendants on his claims under Section 548(a)(1)(A) and Florida Statute Section 726.105(1)(a) in Counts 1, 8, 9, and 17 of the Complaint as to the Debtor's actual intent to hinder, delay or defraud its creditors and for such other relief as the Court may deem appropriate.

Respectfully submitted this 6th day of June, 2011.

**WE HEREBY CERTIFY that we are admitted to the Bar of the U.S. District Court for the Southern District of Florida and that we are in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).**

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel to the Chapter 11 Trustee*
100 S.E. 2nd Street, Suite 4400
Miami, Florida 33131
Telephone: (305) 349-2300
Telecopier: (305) 349-2310

By: /s/  John H. Genovese
       John H. Genovese, Esq.
       Florida Bar No. 280852
       David C. Cimo, Esq.
       Florida Bar No. 775400
       Theresa Van Vliet, Esq.
       Florida Bar No. 374040
       Robert F. Elgidely, Esq.
       Florida Bar No. 111856
       Jesus M. Suarez, Esq.
       Fla. Bar No. 60086

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Motion Of Plaintiff, Chapter 11 Trustee Herbert Stettin, For Partial Summary Judgment Against The Defendants As To The Debtor's Actual Intent To Hinder, Delay Or Defraud Creditors has been furnished via the Court's CM/ECF System to SCOTT L. BAENA, ESQ., Bilzin Sumberg Baena Price & Axelrod LLP, 1450 Brickell Avenue, 23rd Floor, Miami, Florida 33131-3456, on the 6th day of June, 2011.

By:/s/ John H. Genovese
John H. Genovese, Esq.