UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)
www.flsb.uscourts.gov

In re                                                    CASE NO. 09-34791-BKC-RBR

ROTHSTEIN ROSENFELDT ADLER, P.A.,        CHAPTER 11

     Debtor.

_____/

HERBERT STETTIN, not individually but        ADV. NO. 10-03802-BKC-RBR-A
as Chapter 11 Trustee of the estate of the
Debtor, Rothstein Rosenfeldt Adler, P.A.,

     Plaintiff,

v.

CENTURION STRUCTURED GROWTH
LLC, a Delaware limited liability company,
PLATINUM PARTNERS VALUE
ARBITRAGE FUND LP, a Cayman Islands
limited partnership, and LEVEL 3 CAPITAL
FUND LP, a Delaware limited partnership,

     Defendants.

_____/

**PLAINTIFF, CHAPTER 11 TRUSTEE HERBERT STETTIN'S, RENEWED MOTION
TO COMPEL PRODUCTION OF DEFENDANTS' PRE-PETITION ATTORNEY-
CLIENT AND WORK PRODUCT COMMUNICATIONS BASED UPON THE "AT
ISSUE" DOCTRINE OR, IN THE ALTERNATIVE, MOTION TO REQUIRE
DEFENDANTS TO PRODUCE ALL COMMUNICATIONS CLAIMED TO BE
PRIVILIGED FOR _IN CAMERA_ INSPECTION**

     Herbert Stettin (the "Trustee" or "Plaintiff"), the Chapter 11 Trustee of Rothstein

Rosenfeldt Adler P.A. ("RRA" or the "Debtor"), by and through undersigned counsel, hereby

files his Renewed Motion To Compel Production Of Defendants' Pre-Petition Attorney-Client

And Work Product Communications Based Upon The "At Issue" Doctrine Or, In The

Alternative, Motion To Require Defendants To Produce All Communications Claimed To Be Privileged For *In Camera* Inspection (the "Renewed Motion"), and states in support thereof as follows:

### Introduction

This Renewed Motion presents the issue of the Defendants' truthfulness, their candor to this Court, and the fairness of their litigation strategy. The issue is whether Defendants can assert, *as a matter of fact*, that they acted in "good faith" and "without knowledge," yet refuse to disclose communications that tend to prove or disprove these assertions.

### Certification of Counsel

1. By this Renewed Motion, the Trustee seeks the entry of an order: (i) compelling the Defendants to produce all pre-petition attorney-client and work product communications involving or related to the transfers that are the subject of this avoidance action; or, in the alternative, (ii) requiring the Defendants to produce all communications claimed to be privileged for *in camera* inspection.

2. For the reasons set forth herein, good cause exists to grant the relief requested in this Motion. On November 1, 2011, the Defendants filed an amended Answer and Affirmative Defenses in which they assert that the subject transfers were received in good faith and without knowledge of Rothstein's fraud or fraudulent intent. These affirmative defenses are consistent with the earlier assertions in their Motion to Dismiss that their good faith and lack of knowledge are premised upon "thorough, ongoing, continual, considerable due diligence" conducted with the assistance of counsel. By placing their state of mind at issue in this proceeding, the Defendants cannot shield their pre-petition attorney-client and work product communications from the Trustee's efforts to discover all facts that would have a bearing on the full extent of

their knowledge.  Otherwise, the Defendants have the ability to cherry pick those facts (if any) that would tend to support a good faith defense and to shield other facts that would not.  The at issue doctrine, equity and good conscience demand that the entirety of Defendants' pre-petition attorney-client and work product communications be produced because they are reasonably calculated to lead to the discovery of admissible evidence.

3.      Undersigned counsel certifies that a good faith effort was made to resolve the issues raised in this Motion prior to it being filed, but that such efforts proved futile.

Factual Background

4.      As is well known, Scott W. Rothstein ("Rothstein") pleaded guilty to the perpetration of a massive Ponzi scheme from in or about 2005 to in or about November 2009 and has been sentenced to 50 years imprisonment for his crimes.

5.      Rothstein utilized the Debtor to secure capital from investors for the stated purpose of making discounted lump sum payments to the Debtor's putative clients who had entered into pre-suit, confidential settlements with putative defendants in exchange for assignments of the full settlement proceeds which had purportedly been deposited and were being maintained in the Debtor's financial institution accounts.

6.      In fact, Rothstein completely fabricated the existence of the Debtor's putative clients, the putative defendants, the claims, the settlements, and the settlement proceeds (the "Ponzi scheme").

7.      Centurion Structured Growth, LLC, Platinum Partners Value Arbitrage Fund LP, and Level 3 Capital Fund LP ("Centurion," "Platinum," and "Level 3," respectively, or collectively, the "Defendants") are hedge funds which solicit to acquire, sell, re-position, and/or liquidate the funds' investment portfolios.

8.      In the period March, 2008 to April, 2009, the Defendants channeled their investor funds to the Debtor for the purpose of funding discounted lump sum payments to the Debtor's putative clients and profiting on extraordinary returns.

9.      On December 20, 2010, the Trustee filed a Complaint seeking to avoid and recover the following transfers by the Debtor under Sections 544, 547, and 548 of Title 11 of the United States Code (the "Bankruptcy Code") and Chapter 726 of the Florida Statutes: (a) $127,661,053.25 through a conduit collection account to Centurion (the "Centurion Transfers") for the period April 25, 2008 through October 22, 2009 (including $2 million in the 90 day period prior to the Petition Date); (b) $261,444,483.12 through a conduit collection account to Platinum (the "Platinum Transfers") for the period July 28, 2008 through October 23, 2009 (including $19 million in the 90 day period prior to the Petition Date); (c) $6 million directly to Platinum (the "Direct Platinum Transfers") on October 2, 2009; and (d) $26,530,435.90 through a conduit collection account to Level 3 (the "Level 3 Transfers") for the period November 20, 2008 through August 28, 2009 (including $1 million in the 90 day period prior to the Petition Date), (collectively, the "Subject Transfers").[1] *See* ECF No. 1, ¶¶ 48, 49, 50 and Exhibits A - D.

10.     On March 2, 2011, the Defendants filed a Motion to Dismiss the Complaint.  ECF No. 27.

11.     In the Motion to Dismiss, the Defendants directly placed their state of mind at issue by making the following factual assertions concerning their pre-petition actions and knowledge as evidence of their "complete" good faith and lack of knowledge:

        (a)     p. 2: "the Trustee is well aware that between April 3, 2008 and April 10, 2009, there was ***no information*** that would have led the Funds to suspect

---

[1]   The allegations of and exhibits to the Adversary Complaint are incorporated herein by this reference.

4

that they were advancing monies to a Ponzi scheme.";

(b)    p. 3: "Nevertheless, instead of limiting his claims to the period of April 10, 2009 and thereafter (*a period during which the Funds continued to act in good faith* . . . .";

(c)    p. 3: "In his effort to *overreach*, the Trustee runs roughshod over the facts, *pretending* the Funds knew or suspected from the outset that they were advancing monies to a Ponzi scheme.";

(d)    p. 3: "The Trustee has now accused the three Funds' managers of investing hundreds of millions of dollars into a program they knew or suspected was a Ponzi scheme. That is an extremely serious accusation that must be supported by concrete facts, not conclusions and conjectures. The Complaint sets forth no such facts.";

(e)    p. 4: "The Funds engaged in *thorough, ongoing, and continual due diligence*, which is to their credit, not to their detriment, as the Trustee contends.";

(f)    p. 4: "There is *no connection* between that slowdown and Rothstein's supposed inability to make timely payments, which was *not known* to the Funds until April 10, 2009.";

(g)    p. 5: "The Trustee has not pleaded any facts *because there are no facts that support the Trustee's allegations*.";

(h)    p. 5: "To the extent that event gave rise to a duty to inquire, at an appropriate time (and if necessary), *the finder of fact will agree that post-April 10, 2009, the Funds discharged all legal obligations and acted in*

5

*good faith*.  But of critical significance for this Motion to Dismiss is that prior to April 10, 2009, there was no substantive deviation from any payment obligations, and *no reason whatsoever for suspicion on the part of the Funds*.";

(i)     p. 11: "*Centurion engaged in considerable due diligence to satisfy itself that the immediate collateral for the loans, i.e., the Banyon Entities' investments, were legitimate and secure.  Centurion retained the prominent corporate law firm Troutman Sanders LLP ("Troutman") to assist with the due diligence*.";

(j)     p. 12: "*The Troutman firm represented Centurion in its negotiations with the Levins.  Through Troutman, Centurion agreed to the terms of a line of credit with the Levins*.";

(k)     p. 13: "*Troutman was further engaged to confirm the Levins' ownership of the properties*.";

(l)     p. 13 fn. 4 "Any suggestion by the Trustee that the Funds invested knowingly in a Ponzi scheme is inconsistent with the fact that Centurion specifically negotiated to be the sole source of funding for the Banyon Entities.";

(m)     p. 16: "*With the favorable conclusion generated by the due diligence process, Platinum went forward with the investment, and Centurion continued to do so as well*.";

(n)     p. 16: "In October 2008, Level 3 was introduced by Platinum to the opportunity to invest with Levin, *and retained Troutman to negotiate*

6

*loan terms with Levin substantially similar to those of Platinum and Centurion*.";

(o)    p. 17: "It is ***ludicrous*** for the Trustee to assert that investment managers would invest hundreds of millions of dollars in a known or suspected Ponzi scheme, and would do so, moreover, in a manner that steadily increases the aggregate amount outstanding.";

(p)    p. 18: "***The Funds made these investments in complete good faith, on the strength of their due diligence coupled with the contractual safeguards described above***.";

(q)    p. 18: "***The Funds' ongoing due diligence continually reconfirmed the safety and legitimacy of the investment. . . .***";

(r)    p. 19: "Nevertheless, the Funds continued to advance monies to the Banyon Entities in substantial amounts, and ***in complete good faith, wholly unaware of the true nature of the Rothstein settlement program***.";

(s)    p. 19: "In sum, with respect to the events that pre-dated April 10, 2009, there are no facts set forth in the Complaint that support the allegations that: (iii) ***the Funds were acting in anything other than complete objective and subjective good faith***.";

(t)    p. 19: "Prior to April 10, 2009, ***there were no "red flags" to suggest that the Rothstein settlement program was anything other than what it was represented to be***.";

(u)    p. 20: "***Unable to plead any facts to the contrary, the Trustee fabricates***

*and distorts facts to create the illusion that from the very first dollar, the Funds advanced all monies under a cloud of suspicion*.";

(v)     p. 20: "***Recognizing that the Funds' strict verification program constitutes powerful evidence of good faith* . . . .**";

(w)     p. 21: "***The Funds engaged in thorough, ongoing, and continual due diligence, which is to their credit, not to their detriment, as the Trustee pretends.  The due diligence was conducted in the ordinary course, and was not prompted by any "red flags."***";

(x)     p. 25: "As noted above, to the extent that the events of April 10, 2009 gave rise to a duty to inquire, ***the Funds will demonstrate at an appropriate time, if necessary, that they discharged that duty lawfully and in good faith, meeting and exceeding all due diligence obligations***.";

(y)     p. 34: "As noted above, while the evidence would show that even post-April 10, 2009 there were no fraudulent transfers to the Funds, because ***the Funds met and exceeded their due diligence obligations and were acting in complete good faith* . . . .**".

(Emphasis supplied).

15.     In plain language, the Funds placed their state of mind at issue in this proceeding by stating that *counsel assisted them* with "thorough, ongoing, continual, considerable due diligence" and that such diligence revealed: (a) "no information that would have led [them] to suspect that they were advancing monies to a Ponzi scheme";  (b) "no connection between that slowdown and Rothstein's supposed inability to make timely payments, which was not known to [them] until April 10, 2009"; (c) "no facts that support the Trustee's allegations"; (d) "no reason

whatsoever for suspicion on the part of the Funds"; (e) they were "wholly unaware of the true nature of the Rothstein settlement program"; (f) "there were no "red flags" to suggest that the Rothstein settlement program was anything other than what it was represented to be"; (g) "[t]he due diligence was conducted in the ordinary course, and was not prompted by any 'red flags,'" and that they, therefore, received the Subject Transfers in complete good faith.

16.    Based upon these unverified assertions of pre-petition actions and knowledge, the Funds accused the Trustee of fabricating and distorting the factual allegations in the Complaint.

17.    On June 6, 2011, the Trustee filed a Motion to Compel Production of Pre-Petition Attorney-Client and Work Product Communications based upon the "at issue" doctrine (the "Motion to Compel").  ECF No. 90.

18.    On September 27, 2011, the Court entered an Order denying the Defendants' Motion to Dismiss (with the exception of the constructively fraudulent transfer claims).  ECF No. 202.

19.    On September 29, 2011, the Court entered an Order denying the Motion to Compel, without prejudice, because the Defendants had not yet filed an answer asserting good faith as an affirmative defense, thereby placing their communications with counsel "at issue" in this proceeding.  ECF No. 206.

20.    On November 1, 2011, Defendants filed an amended Answer and asserted the following affirmative defenses:

Second Defense - Each of the Funds took the challenged transfers for fair consideration and without knowledge of fraud.

Third Defense - Each of the Funds took the challenged transfers for value, in good faith, and without knowledge of their voidability. In proving their statutory and

common law defense of good faith, the Funds (i) will not invoke or rely upon advice of counsel and (ii) will not assert that their defense is based upon misunderstanding of the law. The Funds invoke the defense of good faith based upon their own knowledge and lack of knowledge of facts, which facts were not collected or imparted to them by their counsel.

Fourth Defense - Each of the Funds acted without fraudulent intent or knowledge of Rothstein's fraudulent intent.

21.    These affirmative defenses are too clever by half.   The issue is not what Defendants *claim they relied on, or did not rely on,* but rather what factual information was communicated to and from counsel.  Having highlighted as evidence of their due diligence the retention of counsel for purposes of conducting diligence, the Defendants cannot now assert that their good faith is "based upon their own knowledge" and not "facts collected…or imparted by counsel."   The Defendants' affirmative defenses say "trust us, we learned nothing from counsel and communicated nothing to counsel."   Respectfully, the Trustee declines to make such an assumption and, more importantly, is entitled to test it by access to what the Defendants actually did rely upon.[2]

22.    Since the Defendants have now placed their state of mind at issue in this proceeding by asserting that they received the Subject Transfers in good faith and without

---

[2] For example, on April 29, 2009, Defendants received an e-mail from Rothstein advising that he had "borrowed the 15m [million] to pay platinum this week].  A copy is annexed as Exhibit "A." Defendants promptly forwarded this e-mail to Eliot Lauer, counsel of record in the instant proceeding.  Despite their insistence to the contrary, Defendants communicated a key fact to their counsel – that the settlement funds Rothstein claimed were in trust did not exist  and that he was procuring funds from other sources to repay Defendants. From this point forward, Defendants advanced no new money and instead received almost $100 million, monies which Rothstein obtained fraudulently from later investors in the Ponzi scheme.

knowledge of Rothstein's fraud or fraudulent intent, the Trustee submits that the "at issue" doctrine mandates production of the Defendants' pre-petition attorney-client and work product communications. It is grossly unfair to deny discovery of their communications where the Defendants themselves based their actions on advice they received from their lawyers.

Argument

A. DEFENDANTS WAIVED THE ATTORNEY-CLIENT AND WORK PRODUCT PRIVILEGES RELATED TO THE SUBJECT TRANSFERS BY PUTTING THEIR STATE OF MIND AT ISSUE IN THIS PROCEEDING THROUGH THE ASSERTION OF THEIR ALLEGED GOOD FAITH AND LACK OF KNOWLEDGE RESULTING FROM THE DUE DILIGENCE PROCESS AS AFFIRMATIVE DEFENSES.

23.    By asserting good faith as an affirmative defense to the Trustee's avoidance claims, the Defendants have placed their state of mind at issue in this proceeding and have thereby waived the attorney-client and work product privileges involving or related to the subject transfers. *See, e.g., In re Gibco, Inc.*, 185 F.R.D. 296, 300-01 (D. Colo. 1997) (holding that waiver of the attorney client or work product privilege occurred when the privilege holder asserted a "good faith" defense to the trustee's fraudulent transfer claim, which placed the privileged matters directly "at issue"); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1419 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) (holding that by affirmatively asserting good faith, the defendant injected the issue of its knowledge of the law into the case and thereby waived the attorney-client privilege); *In re Rhone-Poulenc Rorer, Inc.*, 185 F.3d 879 (Fed. Cir. 1998) (holding that a litigant implicitly waived the attorney-client privilege when asserting a claim that fairness requires examination of protected communications); *In re Human Tissue Products Liability Litigation*, 255 F.R.D. 151, 161 (D.N.J. 2008), *appeal denied, judgment aff'd*, 2009 WL 1097671 (D.N.J. 2009) (holding by that by going beyond a mere denial by asserting a good faith immunity defense Defendant had impliedly

11

waived the attorney-client and/or attorney work product privileges); *U.S. v. Exxon Corp.*, 94 F.R.D. 246 (D.D.C. 1981) (defendant waived attorney client privilege by raising defense of good faith and the only way to assess or dispute validity of that defense is to investigate the attorney-client communications).

24.    Similarly, in *Stern v. O'Quinn*, 253 F.R.D. 663 (S.D. Fla. 2008), the District Court for the Southern District of Florida determined that the defendants had impliedly waived the work product doctrine related to investigatory materials by stating in their motion to dismiss and discovery requests that they intended to rely on the investigation as a defense to the plaintiff's claims.  In Stern, the plaintiff asserted claims against the defendant-lawyer and his defendant-law firm for slander and false light invasion of privacy relating to the circumstances surrounding the deaths of Vickie Lynn Marshall (a/k/a Anna Nicole Smith) and her son Daniel Smith.  *Id.* at 666.  The defendants filed a motion to dismiss.  *Id.* at 668.  While the motion to dismiss was pending, plaintiff served requests for production of documents from an investigator retained by the defendant-law firm concerning her investigation of, and any communication regarding the plaintiff and others.  *Id.* at 669.  The plaintiff also served discovery requests seeking documents, materials, and information reviewed by the defendant-lawyer, which support the statements attributed to him in the complaint, and documents concerning the defendant-law firm's efforts to investigate whether the lawyer's statements about the plaintiff were true or false. *Id.*  The defendant-law firm filed a motion for protective order claiming that the discovery requests were protected from disclosure by the attorney-client privilege and the work product doctrine.  *Id.*  The plaintiff filed a motion to compel responses to the discovery requests.  *Id.*

25.    In support of the motion to compel, the plaintiff argued that the discovery sought from the investigators was relevant because the complaint alleged that the defendant-lawyer

knowingly and recklessly made false and defamatory public statements regarding the plaintiff and thus what the lawyer "actually knew at the times that he made the alleged statements [would] provide evidence relating to [the lawyer's] state of mind during those times." *Id*. at 671. The plaintiff also argued that "how [the lawyer] chose to direct the investigation bears on [his] allegations that [d]efendants ignored contradictory evidence and purposely avoided learning the truth." *Id* (internal quotation marks omitted). Finally, the plaintiff noted that the defendants, through their discovery responses and briefs, "have already demonstrated their intention to rely as a defense upon [the lawyer's] knowledge at the time of the statements at issue, based on information he received at least in significant part from the [l]aw [f]irm's investigation."

26.    The plaintiff then argued that the defendants impliedly waived the privileges "by indicating [in their motion to dismiss, discovery responses, and briefs on the pending discovery motions] their intention to rely upon the investigation in defending the case." *Id*. at 676. More specifically, the plaintiff argued that "having put the investigation, as well as the [defendant-lawyer's] knowledge, at issue in this case, [d]efendants cannot now avoid discovery about these very areas." *Id*. In response, the defendants acknowledged that they had taken the position that the [defendant-lawyer] had made the statements in good faith, based on what they described as [his] reasonable reliance on information provided to [him] by [the investigator]." *Id*.

27.    In considering the theory of implied waiver, the Court noted that a "a party waives work-product or privilege protection when (1) assertion of the protection results from some affirmative act by the party invoking the protection; (2) through this affirmative act, the asserting party puts the protected information at issue by making it relevant to the case; and (3) application of the protection would deny the opposing party access to information vital to its defense." *Id* (citations omitted).    The Court then cited to *Volpe v. U.S. Airways, Inc.*, 184

13

F.R.D. 672 (M.D. Fla. 1998) to illustrate the manner in which the implied waiver doctrine operates. *Id*. In *Volpe*, the defendant asserted an affirmative defense that demonstrated its intent to rely upon an internal investigation in order to avoid liability on plaintiff's claims of employment discrimination based on sexual harassment. *Id*. As a result, the *Volpe* court concluded that the defendant had put the investigation at issue and had waived any privilege or protection of the documents comprising the complete investigation file, including the investigator's notes and other materials, because the plaintiff was entitled to test the *bona fides* of the investigation. *Id*. at 676-77. The *Stern* court noted that "[i]mplicit in the holding [in *Volpe*] is the idea that it is simply not fair to allow a party to wield the work-product protection as a sword to cut out the heart of an opposing party's case while simultaneously brandishing it as a shield from disclosure of any Achilles heels." *Id*. at 677 (citations omitted).

28.    In light of the issues in the suit, the *Stern* Court found the implied waiver doctrine applicable and ordered production of the discovery. *Id*. In so holding, the Court noted that "in the absence of disclosure of the work-product protected materials, [p]laintiff has no means to combat or otherwise test the veracity of [d]efendants' defenses that [the defendant-lawyer] acted in good faith and did not entertain serious doubts as to the veracity of the matters allegedly stated or purposefully avoid learning the truth. That is because [d]efendants base this defense, in significant part, on [their] investigation, and knowledge concerning these matters falls uniquely within the province of [d]efendants." *Id*.

29.    The district court in *Gibco*, supra, directly addressed the precise issue involved in this case – whether the assertion of a Bankruptcy Code Section 548(c) "good faith" defense resulted in a waiver of the attorney-client and work product privileges. In concluding that a waiver had in fact occurred, the court reasoned that:

14

> [11 U.S.C.A. § 548] permits a bankruptcy Trustee to avoid any transfer of a debtor's interest in property, made within one year of the bankruptcy petition, if the transfer was made with intent to hinder, delay or defraud creditors, and was made when the debtor was insolvent, or if the transfer caused the debtor to become insolvent. ... Assertion of good faith under § 548(c) is an affirmative defense. ... Here, Ingham's subjective knowledge and intent in arranging the lot 12 transfer is directly relevant to a determination of the validity of his good faith affirmative defense. Whether Ingham had subjective good faith concerning the lot 12 transfer is, in large part, dependent on what he and his counsel knew about the circumstances surrounding the transfer, and the purposes they sought to serve by making the transfer. By asserting the affirmative defense of good faith, Ingham has put both the objective circumstances, and his subjective knowledge and intent at issue. ... Thus, to the extent the documents at issue are relevant to determining Ingham's knowledge and intent with regard to the lot 12 transfer, he has waived the attorney-client and work product privileges by asserting the affirmative defense of good faith.

*In re Gibco, Inc.*, 185 F.R.D. at 300-01.

30.    The issue of good faith and absence of knowledge is frequently intertwined with assertions of reliance on counsel's advice.  However, an express assertion of reliance on counsel is not necessary to cause a waiver of the privilege.  It has been aptly stated that "a party need not explicitly rely on advice of counsel to implicate the privileged communications.  Instead, advice of counsel may be placed in issue where, for example, a party's state of mind, such as his good faith belief in the lawfulness of his conduct, is relied upon in support of a claim or defense … [b]ecause the legal advice that a party received may well demonstrate the falsity of its claim of good faith belief, waiver in these instances arises as a matter of fairness." *Arista Records LLC v. Lime Group LLC*, 06 CV 5936 KMW, 2011 WL 1642434, at * 3 (S.D.N.Y. Apr. 20, 2011) (*citing Leviton Mfg. Co. Inc. v. Greenberg Traurig LLP*, 2010 WL 4983183, at *3 (S.D.N.Y. Dec. 6, 2010)).  S*ee also United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (the attorney client privilege may implicitly be waived when a defendant asserts a claim that in fairness to the other party requires examination of protected communications).

31.    Where, in particular, a litigant has asserted equitable claims, the doctrine is

particularly applicable.  *WLIG-TV, Inc. v. Cablevision Sys. Corp.*, 879 F. Supp. 229 (E.D. N.Y. 1994)(plaintiff who attempted to avoid statute of limitation defense claiming inequitable conduct of Defendant waived communications with counsel on that issue); *The Navajo Nation v. Peabody Holding Co., Inc.*, 255 F.R.D. 37, 41 (D.D.C. 2009)(affirmative defenses of waiver, estoppel and laches constituted implied waiver of privilege as to what Plaintiff "knew or should have known").

32.    Applying these authorities to the instant case, the Defendants have directly placed their state of mind "at issue" by asserting their "good faith" and lack of knowledge as affirmative defenses based upon their counsel's involvement in "thorough, ongoing, continual, considerable due diligence."   The Defendants, of course, will likely choose to ignore in their response that their affirmative defense of good faith also must necessarily include "without knowledge" or awareness as an element.

33.    Although the Defendants have sought to retreat from the unequivocal factual assertions contained in their Motion to Dismiss concerning their counsel's involvement in the due diligence process and their apparent lack of knowledge and good faith resulting therefrom, the issue of the Defendants' state of mind remains.  Fundamental fairness dictates that the Trustee be granted access to all information that would have a bearing on the extent of their knowledge, including pre-petition attorney-client and work product communications.

B.    ALTERNATIVELY, THE DEFENDANTS SHOULD BE REQUIRED TO PRODUCE ALL COMMUNICATIONS CLAIMED TO BE PRIVILEGED FOR *IN CAMERA* INSPECTION.

34.    Alternatively, the Trustee respectfully submits that the Defendants should be required to produce all communications claimed to be privileged, including, but not limited to, those documents referenced in the Defendants' privilege and redaction logs (attached hereto), for

*in camera* inspection. *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L. Ed. 2d 469 (1989) (holding that disclosure of allegedly privileged materials to the district court for purposes of determining the merits of a claim of privilege does not have the legal effect of terminating the privilege, and that practice of requiring parties who seek to avoid disclosure of documents to make the documents available for *in camera* inspection is well established in the federal courts); *Kerr v. United States District Court for Northern District of Cal.*, 426 U.S. 394, 404-405 (1976)) (accord).

C.    THE DISCOVERY AT ISSUE.

35.    After filing the Adversary Complaint, the Trustee served discovery on the Defendants. In response, the Defendants served on the Trustee: (i) a privilege log (the "Privilege Log"); (ii) a redaction log (the "Redaction Log"); and (iii) their written response and objections to the Trustee's discovery requests, copies of which are attached hereto as Exhibits B, C and D respectively.

36.    As a preliminary matter, the Defendants have redacted from otherwise responsive and discoverable documents produced to the Trustee massive amounts of communications on the basis that such content is not "relevant."[3]

37.    Courts employ a liberal discovery standard consistent with the spirit and purpose of the discovery rules, even after the 2000 Amendments to the Rule. *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 695 (S.D. Fla. 2007); citing *McMahon v. Eastern Steamship Lines, Inc.*, 129 F.R.D. 197, 198 (S.D. Fla.1989); *Graham v. Casey's Gen. Stores*, 206 F.R.D. 251, 253

---

[3] *See* Redaction Log at Nos. 1, 6, 16, 17, 24, 27, 38, 39, 45, 55, 60-62, 71, 74-79, 82, 92, 103, 104, 106, 113, 114, 116-122, 125, 126, 128-140, 142-148, 152-168, 172, 174-188, 190-191, 193, 194, 196-207, 209-213, 215, 240-245, 249-254, 256-262, 264-266, 273, 276-290, 292, 299, 303-306, 308-322, 325-341, 351-431, 433, 435-440, 442, 443, 450, 455, 457-460, 465, 471-473, 475, 478, 480, 490-492, 494, 495, 497, 500-505, 507-514, 517-561, 563-566, 568-570, - 573-575, 580-582, 590, 594, 596-598, 600-606, 608, 609, 613, 614, 617, 618, 620-622, 624, 625, 627, 630, 631, 635-637, 639-642, 647, 654-656, 658, 661, 662, 667, 669, 670, 675, 676, 680, 686-717, 722, 801-806.

(S.D. Ind. 2002); *White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364, 366 (N.D. Ill.2001).

38.     In order to sustain their discovery objections on the basis of "relevance" in response to this renewed Motion to Compel, the Defendants must show that the requested discovery has no possible bearing on the claims and defenses in this case. *Milinzano*, 247 F.R.D. at 695; *citing Flora v. Hamilton*, 81 F.R.D. 576, 578 (M.D.N.C.1978); *Graham*, 206 F.R.D. at 254 ("The party opposing discovery has the burden of showing the discovery is overly broad, unduly burdensome, or not relevant."). This means that the Defendants must show either that the requested discovery (1) does not come within the broad scope of relevance as defined under Rule 26 or (2) is of such marginal relevance that the potential harm occasioned by discovery would far outweigh the ordinary presumption in favor of broad disclosure. *See also e.g.*, *Giardina v. Lockheed Martin Corp.*, 2003 WL 21276348 (E.D. La. May 30, 2003).

39.     Defendants have failed to make such a showing. Instead, they have asserted a blanket objection of "relevance" to portions of hundreds of documents which they agree are otherwise discoverable. The Trustee requests that the Court compel Defendants to produce these documents without these arbitrary and overbroad redactions.

40.     The table below sets forth specific examples of instances where Defendants have withheld production of documents on the basis of the attorney-client privilege despite having placed those very same communications at issue by asserting a "good faith" affirmative defense. The Trustee respectfully requests that the Court order Defendants to produce the documents set forth in the following pages at Table 1.

**[SEE TABLE 1 ON FOLLOWING PAGE]**

**Table 1**

| Privilege / Redaction<br>Log Nos. |
| --- |
| Privilege Log 1-70, 72-98<br><br>Redaction Log 2-5, 7-15, 15-23, 25, 26, 28-37, 40-44, 46-54, 56-59, 63-70, 72, 73, 80, 81, 83-91, 93-102, 105, 107-112, 115, 123, 124, 127, 141, 149-151, 169-171-, 173, 189, 192-, 195, 208, 214, 291-298, 300, 301, 303, 323, 324, 342-349, 444-449,451, 456, 462-464, 466-470, 474, 479, 481-489, 493, 496, 498-499, 506, 515, 516, 562, 567, 571 |

**WHEREFORE,** the Trustee respectfully requests the Court enter an Order compelling the Defendants to produce all pre-petition attorney-client and work product communications involving or related to the Subject Transfers or, in the alternative, requiring the Defendants to produce all communications claimed to be privileged for *in camera* inspection including, but not limited to, those documents withheld from production on the basis of blanket assertions of relevance, and for such further relief as the Court may deem appropriate.

<u>Reservation of Rights</u>

The Trustee reserves the right, if and when appropriate, to move to compel production of attorney-client privileged and work product documents by separate motion or motions based upon the crime-fraud exception, and upon any other ground not otherwise asserted herein.

Dated this <u>17</u>th day of January, 2012.

Respectfully submitted,

GENOVESE JOBLOVE & BATTISTA, P.A.
*Special Counsel to the Chapter 11 Trustee*
100 S.E. 2nd Street, Suite 4400
Miami, Florida 33131
Tel: (305) 349-2300
Faxr: (305) 349-2310

By:/s/  John H. Genovese
        John H. Genovese, Esq.
        Florida Bar No. 280852
        David C. Cimo, Esq.
        Florida Bar No. 775400
        Robert F. Elgidely, Esq.
        Florida Bar No. 111856
        Jesus M. Suarez, Esq.
        Fla. Bar No. 60086

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on this <u>17th</u> of January, 2012, a copy of the foregoing was served to the parties listed on the attached service list and any party registered with CM/ECF participant who has consented to electronic notice and the Notice of Electronic Filing indicates that Notice was electronically mailed to said party.

By: <u>    /s/ John H. Genovese                    </u>
John H. Genovese, Esq.

<u>**SERVICE LIST**</u>

Scott L. Baena
Bilzin Sumberg Baena Price & Axelrod LLP
1450 Brickell Avenue, 23rd Floor
Miami, Florida 33131-3456
E-Mail: sbaena@bilzin.com
*Counsel for Defendants*